## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>     Plaintiff,<br><br>     v.<br><br>DEREK JASON BARTOLI,<br>a/k/a Derek Bartoli, individually and<br>also d/b/a Phoenix Innovative Solutions LLC,<br>Marketing Consultation Solutions LLC, and<br>KimRain Marketing LLC,<br><br>     Defendant. | Case No. 19-1160<br><br><br>**COMPLAINT FOR CIVIL<br>PENALTIES, PERMANENT<br>INJUNCTION, AND OTHER<br>RELIEF** |

Plaintiff, the United States of America, acting upon notification and authorization to the Attorney General by the Federal Trade Commission ("FTC"), pursuant to Section 16(a)(1) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 56(a)(1), for its Complaint alleges:

1.     Plaintiff brings this action under Sections 5(a), 5(m)(1)(A), 13(b), 16(a), and 19 of the FTC Act, 15 U.S.C. §§ 45(a), 45(m)(1)(A), 53(b), 56(a), and 57b, and Section 6 of the Telemarketing and Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. § 6105, to obtain monetary civil penalties, a permanent injunction, and other relief for Defendants' acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and the FTC's Telemarketing Sales Rule, as amended, 16 C.F.R. Part 310.

### JURISDICTION AND VENUE

2.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), 1345, and 1355.

3.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1), (b)(2), (c)(1), and 15 U.S.C. § 53(b).

2

## THE TELEMARKETING SALES RULE

4.      Congress directed the FTC to prescribe rules prohibiting abusive and deceptive telemarketing acts or practices pursuant to the Telemarketing Act, 15 U.S.C. §§ 6101-6108.  The FTC adopted the Telemarketing Sales Rule ("TSR") in 1995, extensively amended it in 2003, and amended certain provisions thereafter.  16 C.F.R. Part 310.

5.      Among other things, the 2003 amendments to the TSR established a National Do Not Call Registry ("Registry"), maintained by the FTC, of consumers who do not wish to receive certain types of telemarketing calls.  Consumers can register their telephone numbers on the Registry without charge through a toll-free telephone call or over the Internet at donotcall.gov.

6.      Consumers who receive telemarketing calls to their registered numbers can complain of Registry violations the same way they registered, through a toll-free telephone call or over the Internet at donotcall.gov, or by otherwise contacting law enforcement authorities.

7.      The FTC allows sellers, telemarketers, and other permitted organizations to access the Registry over the Internet at telemarketing.donotcall.gov, to pay the fee(s) if required, and to download the numbers not to call.

8.      Under the TSR, a "telemarketer" means any person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer or donor.  16 C.F.R. § 310.2(ff).  A "seller" means any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to the customer in exchange for consideration.  16 C.F.R. § 310.2(dd).

9.      Under the TSR, an "outbound telephone call" means a telephone call initiated by a telemarketer to induce the purchase of goods or services or to solicit a charitable contribution. 16 C.F.R. § 310.2(x).

10.     The TSR prohibits sellers and telemarketers from initiating an outbound telephone call to numbers on the Registry.  16 C.F.R. § 310.4(b)(l)(iii)(B).

11.     As amended, effective September 1, 2009, the TSR prohibits initiating a robocall, an outbound telephone call that delivers a prerecorded message to induce the purchase of any good or service. 16 C.F.R. § 310.4(b)(1)(v).

12.     The TSR requires that sellers and telemarketers transmit or cause to be transmitted the telephone number of the telemarketer and, when made available by the telemarketer's carrier, the name of the telemarketer ("caller ID information"), to any caller identification service in use by a recipient of a telemarketing call, or transmit the customer service number of the seller on whose behalf the call is made and, when made available by the telemarketer's carrier, the name of the seller. 16 C.F.R. § 310.4(a)(8).  Transmitting inaccurate caller ID information, or causing inaccurate caller ID information to be transmitted, is commonly called "spoofing."

13.     Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the TSR constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**DEFENDANT**

14.     Defendant Derek Jason Bartoli ("Bartoli"), also known as Derek Bartoli, has been an active participant in the telemarketing industry for many years, serving as the "dialer" and the "IT guy" for various telemarketing companies, many of which have been the subjects of law enforcement actions.  Bartoli is the developer, operator, and provider of a computer-based telephone dialing platform and related information technology ("IT") services, collectively

4

referred to in this Complaint as the "Autodialer."  Acting individually and through a series of

companies, Bartoli operated the Autodialer for unlawful telemarketing purposes.  Among other

things, he programmed the Autodialer to blast out a large volume of telephone calls, including

calls to telephone numbers listed on the Registry, robocalls, and calls with inaccurate caller ID

information ("spoofed caller ID").  At all times material to this Complaint, acting alone or in

concert with others, Bartoli has formulated, directed, controlled, had the authority to control, or

participated in the acts and practices set forth in this Complaint.  Bartoli resides in this District

and, in connection with the matters alleged herein, transacts or has transacted business in this

District and throughout the United States.

15.     From approximately 2008 through 2018, Bartoli operated the Autodialer for

various telemarketer clients, whether acting individually—as an "independent contractor," "IT

consultant," or "IT director"—or through a series of now-defunct companies, including Phoenix

Innovative Solutions LLC, Marketing Consultation Solutions LLC, and KimRain Marketing

LLC.  Bartoli continues to work as an independent contractor providing IT and programming

services to clients.

16.     Phoenix Innovative Solutions LLC ("Phoenix"), originally Phoenix Technologies

LLC, was a Florida limited liability company incorporated on August 15, 2011.  Bartoli was a

member, manager, and the registered agent of Phoenix.  From approximately 2008 through 2015,

acting individually and then through Phoenix, Bartoli operated the Autodialer for a fee, initiating

millions of robocalls and calls to telephone numbers on the Registry or with spoofed caller ID.

At times, Bartoli procured the Voice over Internet Protocol ("VoIP") telephone services needed

to operate the Autodialer; in exchange, he received additional compensation from the VoIP

service providers.

5

17.     Marketing Consultation Solutions LLC ("MCS"), also doing business as Senior Care Services and as Security Protection Group, was a Florida limited liability company incorporated on August 10, 2016.  Bartoli was the sole member, manager, and the registered agent of MCS.  From approximately 2016 through 2018, acting individually and through MCS, Bartoli operated the Autodialer for a fee, initiating millions of robocalls and calls to telephone numbers on the Registry or with spoofed caller ID.  At times, Bartoli procured the VoIP telephone services needed to operate the Autodialer; in exchange, he received additional compensation from the VoIP service providers.  Beginning in September 2017, acting through MCS, Bartoli used the Autodialer to call consumers in order to sell them various goods and services.  MCS then sold the sales deals to its telemarketer clients, which provided ("fulfilled") the goods and services to consumers.  Bartoli used MCS to open at least two corporate bank accounts to receive payments from clients and pay for expenses.

18.     KimRain Marketing LLC ("KimRain") was a Florida limited liability company incorporated on October 24, 2017.  Bartoli was the registered agent of KimRain, and his wife, Kimberly Marie Rainwater, was its sole member.  Bartoli used KimRain as a corporate front. From approximately November 2017 to April 2018, Bartoli funneled sales deals generated by MCS to KimRain.  In turn, KimRain sold the sales deals to MCS's telemarketer clients, which fulfilled the goods and services to consumers.  KimRain opened at least one corporate bank account to receive payments from clients, transfer money to MCS, and pay for expenses.

**COMMERCE**

19.     At all times material to this Complaint, Defendant has maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

6
## DEFENDANT'S BUSINESS ACTIVITIES

*Bartoli Built and Sold the Autodialer for Telemarketing Purposes*

20.     Bartoli is experienced in IT, computer, and telephone technologies employed by telemarketing companies.  For example, he has set up computer and telephone systems used by operators of telemarketing call centers.  He has also created and programmed websites used to solicit consumers and has maintained customer records management or "CRM" databases used to store information about consumers who have purchased products.

21.     Bartoli is also experienced in VICIdial, the open-source call center software that Bartoli used to build and develop the Autodialer.  In its basic form, the Autodialer is a server or computer hardware that runs the VICIdial software and connects to a VoIP telephone line.

22.     The Autodialer dials a list of telephone numbers ("lead lists") and reacts according to the response of call recipients.  Bartoli programmed the Autodialer to perform at least two types of dialing: "broadcast dialing" and "predictive dialing."  Broadcast dialing, also known as "press-1 robocalls," involves initiating outbound calls that deliver a prerecorded message to consumers on a lead list.  If a consumer answers the phone, the robocall pitches a product and then instructs the interested consumer to "press 1."  If the consumer presses 1, the consumer is transferred to a live telemarketer agent.  Predictive dialing involves initiating outbound calls to consumers on a lead list.  If a consumer answers the phone, the consumer is either (i) transferred automatically to a live telemarketer agent or (ii) according to Bartoli, presented with a set of prerecorded questions to determine the consumer's interest in a product and then, depending on the consumer's responses, transferred to a live telemarketer agent.  The Autodialer enables Bartoli to blast out a large volume of calls quickly and cheaply, with the

ultimate goal of transferring interested consumers to live telemarketer agents who will then pitch

the consumers their products.

23.     As the "dialer," Bartoli performed important steps to prepare the Autodialer to

initiate the calls.  Among other things, Bartoli would (i) load the lead list on the Autodialer and

at times would procure the lead list and be responsible for "scrubbing" it, the process of

removing telephone numbers enrolled on the Registry from the lead list; (ii) load the robocall

recording on the Autodialer and at times would create or procure the recording; (iii) program the

caller ID information that appeared on the call recipients' telephones or caller ID devices; and

(iv) adjust the Autodialer settings to establish the volume of calls to be dialed based on the

number of live telemarketer agents available.  Then, at the time agreed upon with his clients,

Bartoli activated the Autodialer to initiate the calls.  Bartoli received substantial fees in exchange

for operating the Autodialer and providing related IT services to his clients.

24.     Bartoli also developed business relationships with VoIP service providers and at

times entered into contractual agreements with them.  As part of his bundle of services, Bartoli

referred clients to these service providers to buy VoIP services, including the "VoIP minutes"

needed to operate the Autodialer.  In exchange, Bartoli received a commission from the VoIP

service providers based on the number of VoIP minutes his clients purchased.

*Bartoli Operated the Autodialer to Initiate Unlawful Telephone Calls*

25.     Bartoli is a "telemarketer" and was a "seller" engaged in "telemarketing" as those

terms are defined in the TSR.

26.     Bartoli is engaged in telemarketing by a plan, program, or campaign conducted to

induce the purchase of goods and services by the use of one or more telephones and which

involves more than one interstate telephone call.

27.     From approximately 2008 through 2017, Bartoli was the "dialer" and "IT guy" for telemarketing companies that sold and fulfilled various goods and services, including vacations, cruises, and travel packages, fall detectors and medical alert systems, auto warranty, life insurance, and debt relief services.  Bartoli built and operated the Autodialer to call consumers, who were then transferred to live telemarketer agents employed by clients of Bartoli and Phoenix.

28.     From approximately September 2017 through 2018, Bartoli continued to be the "dialer" and "IT guy" but also became the seller for companies that fulfilled home security systems, medical alert systems, and hearing aid devices.  Bartoli built and operated the Autodialer to call consumers, who were then transferred to live telemarketer agents employed by MCS in a call center in Altamonte Springs, Florida.  After convincing consumers to buy a product, MCS sold the sales deals to its clients, which fulfilled the products to the consumers. MCS received a fee for each sales deal it transferred to these fulfillment companies.

29.     From approximately November 2017 to April 2018, Bartoli used KimRain as a corporate front.  Bartoli funneled sales deals generated by MCS to KimRain.  In turn, KimRain sold the sales deals to MCS's clients, which fulfilled the goods and services to consumers. KimRain received a fee for each sales deal it transferred to these fulfillment companies.

30.     In the course of the telemarketing campaigns described above, Bartoli initiated or caused to be initiated millions of outbound telephone calls to numbers on the Registry.  Bartoli did not scrub the lead lists, or make sure they were scrubbed properly, before he loaded them on the Autodialer.  During the time he operated Phoenix and MCS, he never paid to access the Registry in order to download the telephone numbers not to call.  At the time of these calls, Bartoli and his clients did not have a written agreement from consumers to receive such calls;

nor did Bartoli and his clients have a pre-existing or established business relationship with them. Bartoli initiated these calls to consumers residing in this District and throughout the United States.

31.     In the course of the telemarketing campaigns described above, Bartoli initiated or caused to be initiated millions of outbound telephone calls that delivered a prerecorded message. At the time of these robocalls, Bartoli and his clients did not have a written agreement from consumers to receive such calls.  Bartoli initiated these calls to consumers residing in this District and throughout the United States.

32.     In the course of the telemarketing campaigns described above, Bartoli initiated or caused to be initiated millions of outbound telephone calls with inaccurate or spoofed caller ID information.  As a matter of general practice, Bartoli programmed the Autodialer to engage in illegal "neighbor spoofing," where the caller ID displayed is a telephone number that matches the first six digits of the call recipient's telephone number followed by four random digits. Bartoli initiated these calls to consumers residing in this District and throughout the United States.

33.     Bartoli's Autodialer and related IT services have become so widely employed in the illegal telemarketing industry that they were used to initiate unlawful telemarketing calls for defendants in three separate law enforcement proceedings and one private class action lawsuit.

34.     On March 16, 2016, the United States of America brought an action against Lilly Management and Marketing, LLC, and its principal, Kevin W. Lawrence, in connection with a telemarketing campaign to sell vacation packages.  *U.S. v. Lilly Mgmt. & Mktg., LLC, et al*., No. 6:16-cv-00435-RBD-DAB (M.D. Fla.) (the "*Lilly* case").  The Government alleged that the

defendants initiated illegal robocalls and outbound telephone calls to numbers on the Registry as part of the campaign.

35.     Bartoli was the dialer who initiated the millions of unlawful telemarketing calls at issue in the *Lilly* case.  Bartoli programmed the Autodialer to do broadcast dialing or press-1 robocalls.  In exchange, Bartoli and Phoenix received substantial fees.  During a three-month period in April through June 2015, alone, Bartoli initiated 7,227,300 total calls.  Of this total, 4,001,397 calls were to telephone numbers that had been listed on the Registry for more than 30 days prior to the date of the calls (a "hit rate" of over 55%).  A significant percentage of the total calls involved robocalls and spoofed caller ID.

36.     Subsequent to the Government's enforcement action in *Lilly*, Bartoli continued to initiate unlawful telemarketing calls for his clients.

37.     On July 14, 2016, the FTC and State of Florida brought an action against Lifewatch Inc., MedGuard Alert, Inc. and other defendants in connection with a telemarketing campaign to sell medical alert systems.  *FTC v. Lifewatch Inc., et al.*, No. 1:15-cv-05781 (N.D. Ill.) (the "*Lifewatch* case").  The plaintiffs alleged that the defendants initiated illegal robocalls, outbound telephone calls to numbers on the Registry, and calls with spoofed caller ID as part of the campaign.  As one of the third-party telemarketers, Bartoli programmed his Autodialer to do broadcast dialing or press-1 robocalls in his telemarketing campaign for Lifewatch Inc. and MedGuard Alert, Inc.  Even after the filing of the *Lifewatch* case, Bartoli continued to provide services to both companies.  In exchange, Bartoli, MCS (under the name Senior Care Services), and KimRain received substantial fees.

38.     On March 22, 2018, the FTC brought an action against Alliance Security Inc. and other defendants in connection with their telemarketing to sell home security systems.  *FTC v.*

*Gotra, et al.*, No. 1:18-cv-10548 (D. Mass.) (the "*Alliance Security* case"). The FTC alleged that

the defendants and their third-party telemarketers initiated illegal outbound telephone calls to

numbers on the Registry as part of the campaign. As one of Alliance Security Inc.'s third-party

telemarketers, Bartoli programmed his Autodialer to do predictive dialing in his telemarketing

campaign for that company. In exchange, Bartoli and MCS (under the fictitious name Security

Protection Group) received substantial fees from Alliance Security Inc.

39.     Subsequent to the filing of the FTC's enforcement action in *Alliance Security*,

Bartoli continued to initiate unlawful telemarketing calls for his clients.

40.     On May 8, 2018, a private individual filed a class action lawsuit against Hearing

Better for Life, LLC and several "John Doe" defendants in connection with a telemarketing

campaign to sell hearing aids. *Dolemba v. Hearing Better for Life, LLC, et al*., No. 1:18-cv-

03269 (N.D. Ill.) (the "*Hearing Better* case"). The plaintiff alleged that the defendants initiated

illegal robocalls as part of the campaign. As one of the third-party telemarketers, Bartoli

programmed his Autodialer to do broadcast dialing or predictive dialing in his telemarketing

campaign for Hearing Better for Life, LLC. In exchange, Bartoli and MCS (under the fictitious

name Senior Care Services) received substantial fees.

41.     Subsequent to the filing of the *Hearing Better* case, Bartoli continued to initiate

unlawful telemarketing calls for his clients.

42.     During a six-month period in July 2017 through December 2017, Bartoli initiated

77,447,672 total calls. Of this total, 57,134,629 calls (over 73% hit rate) were to telephone

numbers that had been listed on the Registry for more than 30 days prior to the date of the calls.

A significant percentage of the total calls involved robocalls and spoofed caller ID. Bartoli

initiated these unlawful calls for his clients, including defendants in the *Lifewatch* and *Hearing Better* cases.

*Bartoli Knew the Telephone Calls He Initiated Were Unlawful*

43.     Bartoli is knowledgeable of the FTC's Telemarketing Sale Rule, including the prohibition against calling telephone numbers on the Registry.  Through his telemarketer clients and VoIP service provider partners, Bartoli was aware of consumer complaints resulting from his dialing activities.  The complaints brought to his attention involved consumers who received "spam calls" and/or who received calls even though their telephone numbers were on the Registry.

44.     On December 19, 2017, the FTC issued Bartoli a Civil Investigative Demand ("CID") as part of an investigation into whether Bartoli and/or his affiliates were engaged in illegal robocalling and caller ID spoofing.  The FTC served the CID on December 23, 2017. The CID directed Bartoli to respond to document requests and interrogatories and to provide sworn testimony during an investigational hearing.  Bartoli failed to respond to the CID, including FTC staff's attempts to confirm whether he would appear for the IH.  While he was evading the FTC's duly issued and served CID, Bartoli continued to be a dialer and seller for MedGuard Alert, Inc. and Hearing Better for Life, LLC.

45.     Due to Bartoli's continuing failure to comply, the FTC filed an action in this District to enforce the CID, on April 16, 2018.  *FTC v. Derek J. Bartoli*, No. 6:18-MC-027-ORL-40-GJK (M.D. Fla.).  After the Court threatened Bartoli with contempt, he responded to the CID and appeared at an investigational hearing conducted on July 26, 2018.  During the investigational hearing, Bartoli admitted to initiating the unlawful calls described in this Complaint.  Shortly after the investigational hearing, he terminated his VoIP service account and

13

closed MCS's bank account after draining all of its funds.  Today, Bartoli continues to work as an "independent contractor" providing IT and programming services.

## VIOLATIONS OF THE TELEMARKETING SALES RULE

### Count I
### Calls to Telephone Numbers Listed on the National Do Not Call Registry

46.     In numerous instances, in connection with telemarketing, Bartoli has initiated or caused others to initiate outbound telephone calls to telephone numbers on the Registry, in violation of the TSR, 16 C.F.R. § 310.4(b)(1)(iii)(B).

### Count II
### Calls that Deliver Prerecorded Messages

47.     In numerous instances, in connection with telemarketing, Bartoli has initiated or caused others to initiate outbound telephone calls that delivered a prerecorded message, in violation of the TSR, 16 C.F.R. § 310.4(b)(1)(v).

### Count III
### Failure to Transmit Caller ID Information

48.     In numerous instances, in connection with telemarketing, Bartoli has failed to transmit or cause to be transmitted to caller identification services the telephone number and name of the telemarketer making the call, or the customer service number and name of the seller on whose behalf the telemarketer called, in violation of 16 C.F.R. § 310.4(a)(8).

## CONSUMER INJURY

49.     For the foregoing reasons, Plaintiff has reason to believe that Bartoli is violating or is about to violate laws enforced by the FTC.

14

50.      Consumers in the United States have suffered and will continue to suffer substantial injury as a result of Bartoli's violations of the TSR.  Absent injunctive relief by this Court, Bartoli is likely to continue to injure consumers and harm the public interest.

### THIS COURT'S POWER TO GRANT RELIEF

51.      Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and other ancillary relief to prevent and remedy any violation of any provision of law enforced by the FTC.

52.      Section 19 of the FTC Act, 15 U.S.C. § 57b, and Section 6 of the Telemarketing Act, 15 U.S.C. § 6105, authorize this Court to grant such relief as the Court finds necessary to redress injury to consumers resulting from Bartoli's violations of the TSR.

53.      Section 5(m)(l)(A) of the FTC Act, 15 U.S.C. § 45(m)(l)(A), as modified by Section 4 of the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended, and as implemented by 16 C.F.R. § 1.98(d), authorizes this Court to award monetary civil penalties of up to $42,530 for each violation of the TSR, 16 C.F.R. § 1.98(d).  Bartoli's violations of the TSR were committed with the knowledge required by Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(l)(A).

54.      This Court, in the exercise of its equitable jurisdiction, may order disgorgement and award ancillary relief to prevent and remedy any violation of the TSR or the FTC Act.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court, as authorized by Sections 5(a), 5(m)(1)(A), 13(b), and 19 of the FTC Act, 15 U.S.C. §§ 45(a), 45(m)(1)(A), 53(b), 57b, and Section 6 of the Telemarketing Act, 15 U.S.C. § 6105, and pursuant to its own equitable powers:

15

A.      Enter judgment against Defendant and in favor of Plaintiff for each violation alleged in this Complaint;

B.      Award Plaintiff monetary civil penalties from Defendant for every violation of the TSR;

C.      Enter a permanent injunction to prevent future violations of the TSR and the FTC Act by Defendant;

D.      Award Plaintiff additional relief, including disgorgement and/or damages, the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.

16

Dated:  6/21/2019_____

OF COUNSEL:

JON MILLER STEIGER
Regional Director
East Central Region
Federal Trade Commission

/s/ Fil M. de Banate_____
Fil M. de Banate, OH # 86039
Amy C. Hocevar, OH # 75510
Christian M. Capece, WV # 10717
Attorneys
Federal Trade Commission
1111 Superior Avenue East, Suite 200
Cleveland, Ohio 44114
fdebanate@ftc.gov
ahocevar@ftc.gov
ccapece@ftc.gov

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General
Civil Division

MARIA CHAPA LOPEZ
United States Attorney

GUSTAV W. EYLER
Director
Consumer Protection Branch

/s/ Rachel Baron_____
Rachel Baron
Trial Counsel
Consumer Protection Branch
U.S. Department of Justice
P.O. Box 386
Washington, D.C. 20044
202-532-4488
Rachel.e.baron@usdoj.gov

/s/ Lacy R. Harwell, Jr._____
Lacy R. Harwell, Jr.
Assistant U. S. Attorney
Fla. Bar No. 714623
400 N. Tampa St., Suite 3200
Tampa, FL 33602
Tel: (813) 274-6000
Randy.Harwell@usdoj.gov